In the Matter of the Estate of Peter Mansour, n. c. m., Frank T. Hines, Administrator of Veterans' Affairs, and P. W. Zerwekh, Guardian *ad litem* for Peter Mansour, n. c. m., Appellants, v. George Solomon, Guardian of the Person and Estate of Peter Mansour, n. c. m., Respondent and Cross-Appellant.—185 S. W. (2d) 360.

St. Louis Court of Appeals.   Opinion filed February 6, 1945.

624

*P. W. Zerwekh* and *B. C. Slattery* for appellants.

*Harry A. Frank* for George Solomon, guardian, respondent and cross-appellant.

*Walter R. Mayne* for Guardian's Surety.

McCULLEN, J.—This is an appeal and cross-appeal wherein Frank T. Hines, administrator of veterans' affairs, and P. W. Zerwekh, guardian *ad litem* for Peter Mansour, have appealed from the judgment of the Circuit Court of the City of St. Louis approving certain disbursements made by George Solomon, guardian of the person and estate of Peter Mansour, *non compos mentis,* and George Solomon has appealed from that part of the same judgment denying and disallowing credit to him as guardian for certain other disbursements and removing him as guardian. Hines, administrator of veterans' affairs, and Zerwekh, guardian *ad litem* for Peter Mansour, will be referred to in this opinion as appellants, and Solomon, guardian of the person and estate of Peter Mansour, will be referred to as guardian.

Peter Mansour, the ward, is a native of Syria and still is a Syrian national. He is a veteran of the first World War, having served in the United States Army from April, 1914, to January, 1918. He became insane and, in January, 1928, was discharged from the Army and admitted to a government hospital in the District of Columbia for treatment and care. Later he was transferred to the Veterans' Hospital at North Little Rock, Arkansas, and in August, 1935, was transferred to the Alexian Brothers Hospital in the City of St. Louis, Missouri, where he remained until April, 1936. On January 12, 1924, George Solomon, also a native of Syria, but a naturalized citizen of the United States, was appointed, by the Supreme Court of the District of Columbia, Committee for Peter Mansour, and, on February 19, 1932, was appointed, by the Probate Court of the City of St. Louis, as guardian of the person and estate of Peter Mansour. The administration of the estate in the District of Columbia was closed and Solomon was discharged as Committee, but continued to act as guardian of the person and estate of Peter Mansour under his appointment by the Probate Court of the City of St. Louis. Said guardian has been a resident of the City of St. Louis since 1908.

The cause herein originated in the Probate Court of the City of St. Louis where, on December 10, 1935, the guardian filed an application for an appropriation of $5000 to be made out of the funds of the estate of his ward for expenses of a trip to be made by said ward and his guardian to Syria for the purpose of visiting the ward's brother and sisters.

On January 23, 1936, after a hearing on said application of the guardian, the probate court entered an order that the sum of $3000 "be and the same is hereby appropriated out of the assets of said ward's estate to defray the expense of such a trip." The estate of the ward at that time amounted to more than $15,000. On April 27, 1936, the guardian, with his ward, departed from St. Louis and, on May 18, 1936, arrived by steamship in Beirut, Syria. The ward, Peter Mansour, who was known in Syria as Mansour Hatem, was taken to and remained at the home of his brother, Boutros Hatem, in the

town of Ebreen, Lebanon, Syria. Ebreen is a little more than an hour's ride by automobile from Beirut. Boutros Hatem was also known as Peter Hatem in Syria. The guardian had stated in his application to the court that the journey would require from three to four months and that upon their return he would file a full accounting of his expenditures of the appropriation.

On October 30, 1936, while the guardian and his ward were still in Syria, a second application (also referred to as petition) was filed in the Probate Court of the City of St. Louis for an additional sum of $2000 from the ward's estate to meet the expenses of the visit in Syria. On the same date the probate court entered its order as follows: "The court appropriates the additional sum of $2000 out of the estate of said ward to defray the expenses of said ward and said guardian on their extended visit to Syria, as prayed for in said petition."

According to the guardian's testimony, the extended stay in Syria was caused by the refusal of Boutros Hatem, the ward's brother, to permit the ward to be returned to the United States. The guardian testified that he consulted the American Consul in Beirut, Syria, two or three times and told him the whole story about the ward, but that the consul said to him: "I am sorry, Mr. Solomon, he is not an American citizen; you see, he is a native from this country, I can't do nothing with him." The guardian thereafter asked for and received instructions by cable from his counsel in St. Louis, pursuant to which he made arrangements to return to the United States alone, which he did, leaving his ward in Syria in charge of the ward's brother. The guardian arrived in St. Louis on April 27, 1937, having been gone exactly one year.

On July 10, 1937, the guardian filed in the probate court a supplemental report of disbursements showing that he had expended a total sum of $6782.06 in connection with the journey and the visit in Syria, which amount exceeded the two appropriations totaling $5000, theretofore made, by the sum of $1782.06. There were seventy-five items of expenditures shown in said report, which is styled "Supplemental Report and Petition of Guardian." The guardian prayed therein that the court approve said report and make an order allowing him said additional sum of $1782.06, and also a further allowance of $1500 for maintenance of the guardian's family during his year's absence from his home, and compensation.

On March 29, 1938, the administrator of veterans' affairs filed in the probate court exceptions to the guardian's supplemental report and petition for additional allowances. The exceptions are thirty-nine in number and go to all but a few of the items of the guardian's report, totaling $720 for railroad and steamship fare and expenses connected therewith. The exceptions charged that the guardian had perpetrated a fraud upon the estate of his ward and upon the court, and had spent the larger part of his time in Syria with his own relatives; that

he failed to comply with the original order of the probate court in that he failed to keep an accurate account of the actual expenses and failed to keep *bona fide* receipts covering the alleged expenditures. The exceptor prayed that the estate of the ward be charged with "only those items which are clearly and positively shown to have been made by said guardian in the interest and welfare of said ward and not the guardian individually, and that any sums expended by the guardian on his own account, or on account of persons other than the ward, be surcharged against the guardian individually and the National Surety Corporation."

On April 15, 1938, the administrator of veterans' affairs filed in the probate court a petition asking for the removal of the guardian on the ground that the guardian had falsified, in part, his report of expenditures.

On April 8, 1938, the guardian filed a motion in the probate court to strike the exceptions of the administrator of veterans' affairs from the files, and on June 22nd filed therein a motion to strike from the files the motion of the administrator of veterans' affairs for the removal of the guardian.

On September 20, 1939, the probate court overruled the guardian's motion to strike the exceptions from the files; overruled the guardian's motion to strike from the files the petition for the guardian's removal; sustained all of the exceptions of the administrator of veterans' affairs; found from the evidence that the sum of $1950 was sufficient to defray all of the expenses of the guardian and his ward; ordered that the account of the guardian be surcharged in the sum of $3050; ordered the revocation of the authority of the guardian, and that the guardian make a settlement of his accounts to the date of said revocation.

On October 18, 1939, the guardian prayed for and was allowed an appeal from the probate court to the circuit court of the city of St. Louis.

In June, 1943, the cause was tried *de novo* by the circuit court without a jury, the trial was concluded, and the cause submitted to the court.

On September 14, 1943, the circuit court made its finding and rendered judgment on the exceptions of the administrator of veterans' affairs, and thereafter all the parties filed their respective motions for a new trial. At that time it appeared that the probate court had appointed one James E. Crowe as guardian *ad litem* while the cause was pending in the circuit court, and said Crowe filed a motion to vacate the judgment of the circuit court entered September 14, 1943. The guardian then filed a motion to strike the motion of James E. Crowe from the files.

On November 4, 1943, on the court's own motion, the finding and judgment of September 14, 1943, was set aside and vacated and the

cause taken as re-submitted, and a new finding and judgment was entered as follows:

"(1). That the supplemental report of George Solomon, guardian of Peter Mansour, n. c. m., for expenditures up to $5000 as appropriated by orders of the probate court is approved and all expenditures in excess of said amount, to-wit, $1782.06 are disapproved and disallowed.

"(2) That the petition of the U. S. Veterans' Administration, as Administrator of Veterans' Affairs, for the removal of George Solomon, Guardian of Peter Mansour, n. c. m., is sustained.

"(3) That the petition of George Solomon, as guardian of Peter Mansour, n. c. m., for compensation in the sum of $1500 is denied.

"(4) That the costs of this proceeding to be taxed against the estate of Peter Mansour, n. c. m., for which execution may issue."

At the same time the court ordered the separate motions for new trial of George Solomon, Guardian of the estate of Peter Mansour, n. c. m., and Frank T. Hines, Administrator of Veterans' Affairs, etc., refiled as to the new judgment and taken as submitted and overruled; and sustained the guardian's motion to strike from the files the motion to vacate filed by James E. Crowe, guardian ad litem.

On November 24, 1943, the circuit court, on its own motion, appointed P. W. Zerwekh as guardian ad litem for Peter Mansour, and thereafter the appeals and the cross-appeal to this court were duly taken, as heretofore stated. Appellants and the guardian, cross-appellant, have filed a stipulation herein that the appeals and cross-appeal shall, in pursuance of Section 1198, Revised Statutes Missouri, 1939, Missouri Revised Statutes Annotated, section 1198, be tried, argued, heard, and submitted in this court as one proceeding in cause No. 26630.

At the trial in the circuit court, Solomon, the guardian, testified at length in support of the various items of his report and petition, but did not produce any vouchers or receipts showing payment by him of any of the sums which he claimed to have disbursed. He testified that he tried to get receipts from the ward's brother, Boutros Hatem, for the various sums of money paid to the brother, but that the brother couldn't write, and, furthermore, that the judge (meaning the judge of the probate court) didn't ask him to bring any receipts. He stated that he put everything in his book "for what and why and what the expense is," and said, "it is an impossibility to get receipts from those people—they think you are going to do something to them—have them arrested or something." He further testified: "I spent $6782.06 as correctly itemized and set forth in my account. I am asking the court to make an additional allowance to me of $1782.06, which is the amount I spent over the $5000 appropriation. All of this money was expended on the trip. The original trip was to be for three months but, due to difficulties over there, I can't come back and his brother refusing to allow my ward to return, it extended

a year. I am also asking for an allowance of $125 per month, or $1500, because I left my minor children without mother, because their mother is dead and I hired old lady to stay with them. I also closed my office because the business could not go on while I was gone.''

Depositions of witnesses taken before the American Consul in Beirut, Syria, on interrogatories and cross-interrogatories, were read in evidence on behalf of the guardian, as follows:

Cablan Simon Georges, a farm laborer living in Ebreen, Syria, a nephew of the guardian, testified that the guardian wanted to put the ward in an asylum at Asfurieh, Syria, but that Boutros Hatem, the brother, always opposed this; that he was present on March 14, 1937, at Ebreen, when the guardian paid 75 pounds to Boutros Hatem for the support of the ward; that the guardian told Boutros Hatem that he intended to take the ward to America, but Boutros Hatem begged the guardian to leave the ward in Syria.

On cross-interrogatories the witness testified that he knew that the guardian provided for the ward, but did not make any effort to obtain receipts for money he paid out; that the guardian did make notes of payments in a notebook which he carried.

Georges Abraham Cablan, a farm laborer living in Ebreen, Syria, testified that he was present when Boutros Hatem was injured in a fight with his insane brother; that he knew that the guardian made an effort to have the ward put in the mental hospital but that the brother, Boutros Hatem, would not agree; that he was present on a number of occasions when the guardian paid Boutros Hatem various sums of money, as follows: May 24, 1936, 60 pounds and 15 pounds; August 16, 1936, at Batroun, about 100 pounds; September 4, 1936, at Ebreen, 200 pounds; that the guardian treated the ward nicely and would visit the ward at the brother's home and give him money.

On cross-interrogatories the witness testified that the guardian is his (the witness's) mother's uncle; that he had no knowledge of any effort on the part of the guardian to obtain receipts for the money he paid Boutros Hatem.

Joseph John Solomon, a brother of the guardian, testified that he was a shoemaker and lived at Ebreen, Syria. The witness described the arrival of the guardian and the ward at Beirut, Syria, on May 18, 1936, and testified, in substance, that he and a party of about twenty-two other persons met them on board the ship and took a boat to the shore; that the guardian gave him 140 Syrian pounds which he paid out for boatmen's fees, broker's fees, automobile charges in town, and other expenses of the party, such as food; that the value of the dollar at that time was 0.75 Syrian pound; that the party then proceeded to Ebreen from Beirut in seven cars for which the witness paid 60 Syrian pounds, also given to him by the guardian; that he saw the guardian pay 200 Syrian pounds to Boutros Hatem, the ward's brother, on May 19, 1936; that the guardian told Boutros Hatem he

was intending to have the ward put in an asylum at Asfurieh but that the ward's brother begged him not to do so, and urged him to leave the ward in his (Boutros') care; that in the latter part of May, 1936, the guardian provided food and refreshments for guests and gave the witness 150 Syrian pounds with which he paid those expenses.

Antoin Cachon, a priest by profession, living in Ebreen, near Batroun, Syria, testified that when the guardian and the ward arrived in Ebreen from America the ward went to reside with his brother, Boutros Hatem; that the guardian tried to put the ward in the hospital but the ward's brother did not agree to it; that the ward's brother fell on his knees before the guardian and begged him to leave the ward with him; that in October, 1937, he received a remittance from the guardian for which he signed a receipt and returned it to the sender; that he told Boutros Hatem that in order to deliver to him the money for the support of the ward he must have a receipt signed by Boutros Hatem, but that Boutros did not agree to give him such a receipt witnessed by the Mukhtar; that Boutros Hatem refused to give receipts and he, in turn, refused to turn any money over to him because the witness did not trust him; that the general reputation of Boutros Hatem in the village was good, but he had no financial dealings with anybody in the village; that, ''I know if anyone lends him money he does not return it.''

Kiwaan S. Kiwan, a chemist by occupation, residing in Batroun, Syria, and distantly related to the guardian, testified that he was present on July 25, 1936, when the guardian paid money to Boutros Hatem, that he didn't know exactly how much money, but it was more than 100 Syrian pounds; that the guardian told Boutros Hatem that the money was to be spent for the support of the ward; that he was present on a number of occasions when the guardian said that it would be better for all concerned to send the ward to Asfurieh, but that Boutros Hatem used to cry and say: ''No, leave him with me''; that on two occasions the guardian bought medicines from the pharmacy of the witness's father, but he did not know the price of the medicines nor the dates when they were bought.

The administrator of veterans' affairs introduced in evidence depositions of witnesses which also were taken before the American consul at Beirut, Syria, as follows:

Boutros Hatem, brother of the ward, living in Ebreen, Lebanon, Syria, testified that he was one of the party that met and received the guardian and the ward on May 18, 1936, at Beirut, Syria, when they arrived from America. He named a number of the guardian's relatives and his own relatives as members of the party. He stated that the party went in two cars to the house of the guardian's brother Joseph in Beirut, and in the afternoon they went in two cars to Ebreen, the others of the party having gone in two cars to their homes in Jdabra, a nearby village; that the guardian paid for all the cars;

that each car cost 3½ pounds Syrian; that they did not go to any hotel, and about ten days later the guardian told him that he, the witness, should keep the ward at his home; that the guardian told him that the ward received $157 per month compensation, but that recently nothing had been received; that the guardian gave him 15 Syrian pounds, saying it was from his own pocket, and stated he would give him further sums when received from the United States. The witness further testified that he did not insist that the ward come to his home instead of being put in a mental hospital, and specifically stated that he did not receive from the guardian the following sums on the dates named, as claimed by the guardian: May 19, 1936, 210 Syrian lira; May 24, 1936, 75 Syrian lira; June 3, 1936, 23 Syrian lira; July 25, 1936, 115 Syrian lira; between June 1 and September 1, 1936, 75 Syrian lira for ironing and laundering; September 4, 1936, 250 Syrian lira; December 3, 1936, 75 Syrian lira; January 26, 1937, 150 Syrian lira; and March 14, 1937, 75 Syrian lira. The witness stated that shortly after the guardian arrived in Syria he gave the witness 15 pounds, and two or three months later 7 pounds, and that the guardian "never gave me one piaster except those two items"; that the guardian stayed with his (the guardian's) brother's family and took no interest in the ward while in Syria, and visited him only two or three times when the witness specially asked him to come; that once he fell and hurt his head on a stone, and the guardian came to see him while he was in bed and said he heard that the ward had struck him, but that he told the guardian that the ward had not struck him; that when the guardian was about to return to America the witness did not want him to take the ward back with him because the ward seemed so ill the witness thought he would be better off in Syria. The witness further testified that he did not know why the guardian stayed in Syria nine months instead of three months, according to his original intention; that the witness took the ward to Dr. Sarah who gave him five treatments and stopped because nobody paid him. The witness specifically stated that he did not receive 300 Syrian lira to pay Dr. Sarah on June 17, 1936, and that the guardian did not pay for medicines, nor for clothing or supplies, and did not buy anything for the ward after he came to Syrian; that when the guardian first came he told the witness that he wanted him to take the ward every twenty-five days to Asfurieh for examination; that after Dr. Sarah started to treat the ward the guardian changed his mind; that from the beginning to the end the guardian kept telling him he was not getting any money from America; that in his opinion the guardian should be removed and the ward's money turned over to Christo Nabti, a banker in Syria who had helped the witness and the ward by advancing money to them; that once, during Turkish times, before the war, he was arrested and kept in jail two or three weeks but was never tried; that once a letter and a check were in his

name and he cashed the check and a woman started a suit against him, but he was acquitted; that he learned the check was intended for another person of the same name and he gave back the money.

Touphik Murray Sarah testified that since 1910 he had lived at Batroun, Syria; that he was graduated from the School of Medicine of the American University of Beirut in 1918; that he was first consulted on June 25, 1936, and he examined and treated the ward on July 5, 1936, and on September 14, 1936; that between those dates the ward came occasionally for treatments; that the guardian told him that the ward had money in the United States and was a beneficiary of the Veterans' Bureau and when money was received the witness would be paid his regular fees; that his bill for a total of 30 Syrian pounds was never paid; that his diagnosis of the ward's condition was dementia praecox; that he told the guardian to take the ward to a mental specialist before treatment, but the guardian refused on the ground that he did not have the money for the expense, but said he would pay when he received money from the United States.

Stanley F. Ransone, a resident of Jersey City, New Jersey, Captain of the S. S. Exeter of the American Export Lines when it sailed from New York on April 28, 1936, whose deposition was taken in New York City, New York, testified, in substance, that he recalled Peter Mansour as a passenger on that trip and that he was accompanied by an aid or attendant; that he was not sure but had an impression that Peter Mansour ate at the regular dining table on board the ship; that he was not confined to his room or the hospital; that there was no evidence of misbehavior on his part; that it was customary to serve passengers, if desired, in their cabins at no extra charge except the customary expectation of a voluntary tip equal to ten per cent of the fare, and no record kept of it; that barbers are permitted to shave passengers in their cabins, but it is a very unusual practice. The charge for a shave is 25 cents, and for a haircut 50 cents; that there would be no other necessary expenses for a passenger unless he indulged in the bar; that he recalled the ship stopping at Gibraltar where the usual stay is about one hour; that the ship stopped at Palma, Spain, about a four hour stop, but he did not think that Peter Mansour left the ship at Palma; that the ship stopped at Marseilles, France, in the morning and sailed again on the same day, but he did not recall whether Peter Mansour left the ship at that place; that the ship stopped at Naples, Italy, from six in the morning to eight in the evening, but he did not think Peter Mansour left the ship; that the ship stopped at Alexandria, Egypt, before noon on Thursday and sailed at noon of Saturday in the same week; that Peter Mansour went ashore there and came back early in the evening; that the taxi fare from the ship to the city and return was about $1.00; that the cost of cablegrams from Alexandria to Beirut was about 4½ cents per word; that the ship stopped at Haifa, Palestine, in the afternoon

and sailed the same night, but that Peter Mansour did not go to shore there; that there were no regulations of the ship that required a custodian for Peter Mansour from Haifa to Beirut; that the ship arrived at Beirut on May 18, 1936, in the inner harbor; that a tender is supplied by the ship company without charge, a launch being supplied without cost to passengers other than an expected tip; that during the entire trip from New York to Beirut Peter Mansour did not require the posting of a guard for his person; that he acted a little unusual but not out of the ordinary, and required no additional attendant's services; that they knew his condition and were more or less keeping a watch over him, but not an official watch, and no expenses were incurred.

The last of the depositions introduced in behalf of the administrator of veterans' affairs was that of Ida B. Sneble, stewardess of the S. S. Exeter of the American Export Lines, taken in New York City, New York. She testified that she was registered as a nurse and that as stewardess and nurse she was an assistant to the doctor; that she recalled the trip of the S. S. Exeter sailing April 28, 1936, from New York to Beirut, Syria, under Captain S. F. Ransone, to whom she was responsible; that on said trip Peter Mansour did not appear for treatment in the ship hospital; that she has access to and had reviewed the hospital records of the trip and they showed absolutely nothing concerning Peter Mansour.

Before we can satisfactorily discuss the contentions of appellants we must first pass upon the contention of the guardian. He asserts that the word "appropriation", or the words "to appropriate money", when used in a court order, have the same meaning and effect as when they are stated in a legislative enactment; that "to appropriate" means "to allot or assign, to set apart, or to apply to a particular use or purpose", as held in Jennings v. Kinsey, 308 Mo. 265, 271, 271 S. W. 786, 788.

The guardian quotes from State v. Lee, 163 So. 859, 868, as follows:

"An appropriation of money is the setting it apart officially, out of the public revenue for a special use or purpose, in such manner that the executive officers of the government will have authority to withdraw and use that money, and no more, for that object, and for no other."

He also cites the case of Macon County v. Dixon (Tenn.), 100 S. W. (2d) 5, 16, where the court said:

"An appropriation of funds is an allotment, assignment, or setting apart of such funds to the use of a particular person or persons, or thing or things for particular purposes. . . . in such manner that the executive officers of the government are authorized to use that money and no more for that object and no other."

He calls attention to Section 488, Revised Statutes Missouri, 1939, Missouri Revised Statutes Annotated, section 488, and Section 500,

Revised Statutes Missouri, 1939, Missouri Revised Statutes Annotated, section 500, wherein the word "appropriation" is used, and asserts that it means money spent for the support of an insane person, and that Section 500, *supra,* provides that a county may recover the amount "appropriated" either from the estate of the insane person or a person bound by law to support such insane person.

From the foregoing statutes and decisions the guardian argues that when the probate court in the instant case "appropriated" the two sums totaling $5000 to defray the expenses of the ward and the guardian on the Syrian trip, it thereby approved the project and specified the purpose and object for which the $5000 was to be disbursed; that the guardian, therefore, had full authority to disburse said amount as long as he used it for that particular purpose and no other purpose; that when he filed his report with the probate court itemizing the manner in which he had disbursed the money, such report was sufficient proof of the disbursements and he was not required to file and submit receipts and vouchers for the expenditures he made from the fund.

We are unable to agree with the guardian's contention. It will be noted that the guardian cites no case involving the word "appropriate" or "appropriation" in relation to a guardianship or trust fund. He also overlooks Section 491, Revised Statutes Missouri, 1939, Missouri Revised Statutes Annotated, section 491, which provides that no allowance shall be made to a guardian of an insane person unless the guardian "shall have duly accounted and settled with the probate court for the moneys and effects which shall have come to his hands for the support of his ward . . ." Furthermore, it is established law that guardians, administrators, executors, trustees, and all persons who act in a fiduciary capacity are required to account for money received and disbursed, and to prove disbursements which they claim to have made by producing vouchers, receipts, or other kind of evidence which will meet the reasonable requirements of the court, whence they derive their authority, as to proof of such disbursements.

In 39 C. J. S., Guardian and Ward, sec. 150, p. 252, the general rule is stated thus:

"Proper vouchers for each expenditure should be furnished, but their absence does not necessarily bar allowance of expenditures *where the guardian has acted in good faith and adduces other proof of the correctness of his accounts.*" (Emphasis ours.)

A guardian of an insane person, as well as a guardian of a minor, stands in the relation of a trustee to the funds of the ward coming into his possession. With respect to the accounting by a trustee for expenditure of trust funds, the general rule is stated in "Trusts and Trustees" by Bogert, Vol. 4, sec. 971, subdivision (9), pages 2835, 2836, as follows:

"The burden is on the accounting trustee to prove to the satisfaction of the court the merit of all claims for credit which he makes. . . . Vouchers, receipts, or other written evidence to substantiate payments or transfers should be presented by the trustee, if possible, and may be absolutely necessary as a basis for credit; but ordinarily the court will grant credit without written evidence *if it is thoroughly convinced of the soundness of the trustee's claim.*" (Emphasis ours.)

The principle upon which courts act in safeguarding the interests of minors was clearly stated by this court in the case of In re Taylor's Estate (Mo. App.), 5 S. W. (2d) 457, 461, as follows:

"The courts protect minors' interests jealously, and wherever it can be found that the curator had not tracked the line with severe correctness in disposing of the funds of the wards, the ward may be restored to his rights."

We know of no difference between guardians of minors and guardians of insane persons with respect to their duty to account to the probate court for expenditures of the funds of their wards. Each occupies a fiduciary relationship toward his ward. The need for the court's protection of the ward's property and funds is the same in both kinds of guardianships, and it is the duty of the court in dealing with the funds of insane persons, as well as with those of minors, to require that guardians furnish satisfactory proof, from the viewpoint of the ward's welfare and best interests, of the necessity for expenditures of the ward's funds, as well as proof of the reasonableness of those expenditures found to be necessary. The duty of the court to protect the wards in both classes of guardianships is based upon the incompetency of such wards to protect themselves. The funds of an insane ward must be carefully accounted for at all times because, in the event of his recovery, his estate, less legitimate administration costs, must be restored to him.

We have referred above to the fiduciary relationship of the guardian to his ward. A fiduciary is "a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires." [Black's Law Dictionary, Second Edition. See also, "Fiduciary Relationship" in Words & Phrases, Permanent Edition, Vol. 16, and "Fiduciary" in Vol. 2, Bouvier's Law Dictionary, Third Revision, Eighth Edition.]

In 32 Corpus Juris, section 402, p. 698, the duty of a guardian of an insane person, with respect to accounting, is stated as follows:

"The guardian is in duty bound to duly account for the management of the ward's estate; such duty is assimilated to that of guardians of minors; and the accounts are settled upon the principles governing the settlement of accounts of other fiduciaries having the control of trust funds."

The general rule is that in the management of a ward's estate, the guardian may incur such expenses and make such expenditures as a prudent man would under all the circumstances deem proper and necessary, and he is entitled to credit in his accounts for all proper expenditures, ''but he is not entitled to credit and may be surcharged for any expenditure or disbursement not made for the ward's benefit, or not proper or necessary under the circumstances, or for any portion of the expenditures of which the ward did not directly receive the benefit.'' [39 C. J. S., Guardian and Ward, sec. 88, pp. 154-155.]

The ''appropriation'' by the probate court of the two lump sums totaling $5000 in the case at bar was a mere setting apart from the rest of the estate that amount to defray the expenses of the trip of the ward and his guardian to Syria, but it did not constitute any authority for the guardian to ''disburse'' the funds as he pleased, even though they were spent on the trip. On the contrary, under the authorities to which we have referred, it was the duty of the guardian to give a scrupulously correct account of his expenditures and to show to the court by other satisfactory evidence, in the absence of vouchers or receipts, that the ''disbursements'' were necessary, that they were reasonable, that they were actually paid, and were for the benefit of the ward, before he would be entitled to credit therefor.

We recognize that many small items of expense must be incurred by persons traveling by railroad and steamship for which receipts cannot reasonably be obtained. With respect to this kind of disbursement, neither the law nor the courts require the impossible. In this case, however, the guardian frankly states that he has no vouchers or receipts to show any of his disbursements, hence he must prove them by other satisfactory evidence. This he has failed to do with respect to many items in his report, and his oral testimony adds very little to his written report in the way of proof.

The guardian herein has not only failed to produce ''other evidence'' of his disbursements, but on the contrary his report shows on its face some expenditures which were wholly unnecessary to the welfare of the ward and served only the desires of the guardian. Said report also shows expenditures for purposes that in themselves were legitimate and proper, but not reasonable in amount. The report further shows on its face duplication of expenditures for identical items, some partly reasonable and some clearly not necessary or reasonable. A reference to a few of these will be sufficient to warrant the conclusions stated. For example, in the second petition filed by the guardian October 30, 1936, wherein he asked for an additional allowance of $2000, he states that up to September 16, 1936, he disbursed a total of $2980, and that the appropriation of $3000 theretofore made was practically exhausted. Contrasted with this is his supplemental report and petition filed July 10, 1937, wherein he states under his oath that as of the same date, September 16, 1936, he had disbursed ap-

proximately $4300. Both of said statements cannot be true. One or the other is in error or is false. Furthermore, in his affidavit attached to his application of October 30, 1936, he states: "Expenses of railroad and steamship travel from St. Louis to Bayrouth, Syria, including living expenses on board—$580.00"; in addition to which he listed expenses of securing passports, permits, affidavits to petitions, and similar other expenses to secure proper readmission permits, $150. He thus represented in said affidavit that $730 had been disbursed by him up to the time he arrived in Syria, whereas in his supplemental report and petition filed July 10, 1937, he states under oath that he had disbursed more than $1250 as of May 18, 1936, the date that he and his ward arrived in Beirut, Syria. Again we must say that both of these statements cannot be true. One or the other is in error or is false.

In the absence of clear evidence of deliberate falsification, we take such contradictions as errors. Nevertheless, they show such a lack of care on the part of the guardian in disbursing the ward's funds and in reporting them to the court as to warrant the court in disregarding a part of such items as not proved, and in scrutinizing with care all the other items in his report, for the guardian's credibility, both as to his report and as a witness, was a proper subject of consideration by the court.

Further example of alleged disbursements by the guardian are shown in his supplemental report and petition of July 10, 1937, wherein he listed items for the period April 28 to May 18, 1936, as follows:

"Custodian for Mansour to watch him and guard him while he was taking exercises and during time he was confined to the room . . . on boat from New York to Haifai, Palestine, ................................$ 85.00
"Amount paid for tips, extra service required for serving meals to Mansour in room, shaves and barber, cigarettes and incidental expenses for Mansour while on boat twenty-one days, ........................................ 150.00
"Tips paid while on boat and miscellaneous expenses for Solomon on passage from New York to Beirut, .......... 100.00
"Additional expense while boat stopped at Gibraltar, ..$   5.00"

The guardian thus asked credit for expenditures totaling $340 in the items above.

Quite aside from the fact that the expenditure of some of the above amounts were shown by the testimony of the Captain of the ship to be wholly unnecessary, it will be observed that one of the items is for $100 in "tips" and miscellaneous expenses while on the boat, while another item also includes "tips" along with extra service for shaves, barber, cigarettes and incidental expenses totaling $150. Such disbursements show that the guardian spent the ward's money extravagantly and without regard to necessity or reasonableness. .

We find also in said supplemental report such items as,

"May 8, 1936, additional expense while boat stopped all day at Palmo Spain, ...............................$ 25.00
"May 9, 1936, additional expense while boat stopped all day at Marseilles, France ........................... 60.00
"May 11, 1936, additional expense while boat stopped all day at Naples, Italy ............................... 20.00
"May 14, 1936, additional expense while boat stopped at Alexandria, Egypt, for three days ....'................$100.00"

In the above items no attempt is made to show what the "additional expense" totaling $205 was for.

Most certainly it was not necessary for the guardian to expend the sums of money stated in his supplemental report for boatmen's fees, automobile charges in town, and other expenses such as food, for the party of twenty-two persons at the time the guardian and his ward arrived at Beirut. Such disbursements might be considered proper for one spending his own money, but not for a guardian spending his ward's funds.

In reporting his disbursements beginning with May 18, 1936, the time of his arrival in Beirut, the guardian refers to the Syrian lira, which at that time he states had a value of $1.32 in American money. He lists disbursements, beginning May 18th and continuing through June, 1936, as 1261 Syrian lira, which in American dollars amounted to $1664.52, for a period of about six weeks, or at the rate of more than $275 per week. The guardian's own testimony in court shows that after his return he disbursed $50 per month for the care of the ward. If we compare the combined expenses of both the ward and guardian in Syria with the cost of the care of the ward alone after the guardian's return from Syria, we find that the guardian's expenditures for the six weeks' period mentioned were at the rate of more than $1100 per month as against $50 per month for the care of the ward alone after the guardian left the Syrian scene. Such a wide difference of expenses between the time when the guardian was present and when he was absent is so great as to require substantial evidence showing that the former were necessary and for the benefit of the ward before their approval would be warranted.

In his supplemental report, under date of January 26, 1937, he states that he gave the ward's brother, Boutros Hatem, for care and support of the ward "and also special for carnival expenses" 150 lira. When asked about this item on cross-examination, the guardian said: "I cannot tell the court about the period time it covered. It also shows carnival expenses. Every year in the old country for two weeks—I don't remember the month—they don't do anything at all except stay and have a good time" Under date of February 28, 1937, the guardian lists a trip to Tripoli, Itoo and Ejbash, in North Lebanon, to arrange for return to the United States, four days' living

and travel expenses, 50 lira. Concerning this item he testified: "This trip to Tripoli, Itoo and Ejbash I made for myself and did not have to go there to make arrangements to return to the United States." An examination of the testimony of the guardian on cross-examination, in relation to the items of his supplemental report, will speak for itself:

"Mr. Zerwekh: Your report shows that you paid Peter Hatem (brother of the ward) 115 Syrian lira on August 16th for maintenance and again you paid him on September 4th, for the same purpose, 250 lira, and you don't know what period of time those two payments were for.

"Witness: That is for purpose—that is all I can answer, for purpose to take care of his brother when he came and ask me for money to support his brother.

"Mr. Zerwekh: And you and Peter Hatem made no agreement as to the rate per day for support and maintenance, or anything of that sort, did you?

"Witness: Why, he come and ask for a different purpose.

"Mr. Zerwekh: You tell the court then every time he asked you for money, you just reached in and got the money for him, is that right?

"Witness: Absolutely, because I had to take care of that ward."

It appears from the guardian's testimony that, at the time of the events herein referred to, Syria was under a French mandate and that the money used was French money but it was referred to as Syrian money; that the Syrian pound and Syrian lira were the same. At one point he testified that the Syrian lira was worth $1.32 in American money. From the testimony of other witnesses it appears that at different times the dollar was worth 0.75 Syrian pound. The guardian testified at another point that about May 9, 1936, when they stopped at Marseilles, the American dollar was worth 59 cents. To what foreign money the 59 cents of American money was thus compared does not appear. Although the difference in value of the dollar in relation to other money might have made expenditures in dollars more or made them less, it had no bearing on the necessity or lack of necessity for many of such expenditures in so far as benefit to the ward was concerned. For example, the guardian testified that it was the custom of the people in Syria to celebrate the return of anyone from the United States; and that in this connection he paid out 210 lira, amounting to about $275 in American money, for care of the ward and to entertain visitors with drinks, etc. This testimony was given in connection with the guardian's attempt, on cross-examination, to explain the following item in his report: "May 20, 1936 to June 1, 1936, to expenses at Ebreen, which the customs of the country require for hospitality to provide food and refreshments for callers and guests for Mansour and Solomon, 250 lira."

The items heretofore referred to are only a few of many disbursements which are of such a nature as to require, in the absence of receipts or vouchers, satisfactory evidence to prove their necessity and reasonableness. The mere statement of the guardian that he disbursed such items and that they were necessary, is not sufficient, under the circumstances, to warrant their approval.

It would unnecessarily lengthen this opinion and serve no useful purpose for us to discuss all the items of disbursements which on the face of the report are, to say the least, open to question. Many of the alleged disbursements show a gross lack of the care and prudence which the law requires of a guardian in disbursing the funds of his ward. This, no doubt, was due to the fact that the guardian was under the impression that it was not necessary for him to account to the court for his disbursements because, as he contends, the court by "appropriating" lump sums on two different occasions thereby authorized him to spend such sums without accounting therefor. That view was, of course, clearly erroneous. The guardian should have known from his experience in acting as guardian for this ward, for many years prior to the trip to Syria, that he was required to make settlements and render accountings to the Probate Court of disbursements of the ward's funds.

Neither the guardian's report nor his testimony shows what periods of time many of his alleged disbursements for the ward's care in Syria covered, nor whether they were for past or future expenses at the time they were paid. This is true also of the depositions of his witnesses. It is evident that his account was stated in line with his contention in the circuit court and in this court that the only thing he was required to do was to show that he spent the funds while he was on the trip and during his visit in Syria, and that since the court had "appropriated" $5000 for the trip and visit he was free to spend it without accounting therefor. To uphold such an accounting as the guardian has made herein would not only be a grave injustice to the insane ward, but would also mean approval of a course of conduct by the guardian contrary to all established conceptions of the duty of guardians of insane persons. Such a ruling would also encourage the grossest extravagance by guardians in the disbursement of the funds of their wards.

We hold that the circuit court erred in approving and allowing the guardian credit for expenditures up to the amount of the $5000 appropriated by the orders of the probate court. We hold also that the circuit court's orders disapproving and disallowing all expenditures in excess of the said $5000, to-wit, $1782.06, and denying the sum of $1500 to the guardian for compensation, and sustaining the motion to remove the guardian and removing him, were correct.

We have searched the record for evidence upon which to base a finding and judgment as to the amount of disbursements for which

the guardian is actually entitled to credit, but we have been unable to find sufficient evidence for that purpose.

Although it is clear that the guardian is not entitled to credit for any such sum as $5000 for necessary and reasonable disbursements, we have no evidence before us to show what was actually spent for board, lodging and meals, and other "necessary" expenses for the guardian and the ward during the. time they were both in Syria, nor is there evidence showing the reasonable and customary charges for such items in that country at that time. It is true that the guardian lists many items showing that he paid "5 lira per day" for "living expenses," and others showing "10 lira per day" for "living and travel expense," which at $1.32 per lira amounts to $6.60 and $13.20 per day, respectively, but there is nothing to show whether such charges were reasonable.

The guardian's report and evidence mostly deal with lump sums paid out at different times for items, some of which were necessary and some of which were clearly unnecessary in so far as any benefit to the ward is concerned. What proportion thereof was necessary and what unnecessary we are unable to determine from the evidence. On the other hand, the testimony adduced by the administrator of veterans' affairs, although contradictory of many of the items of disbursement claimed by the guardian, contains nothing affirmative to show what would be a reasonable charge for those items which may be conceded to have been necessary and for the benefit of the ward. We could, of course, arbitrarily state our own conjecture as to the necessary cost of maintaining the ward and the guardian in reasonable comfort in Syria during the period covered by the evidence, but, much as we wish to conclude the case,. we cannot dispose of it on our own mere guess. There is, however, one phase of the guardian's claim for credit for disbursements concerning which we are not in doubt, and that is that the evidence does not warrant an allowance of expenses for more than six months' absence of the guardian. The fact that the ward's brother refused to permit the ward to return to the United States, and the guardian was forced to return without the ward, is no justification whatever for his remaining abroad more than six months altogether. The evidence shows that he knew the ward would not be permitted to return to the United States in ample time to have finished all his business as guardian in Syria and to have returned to St. Louis well within six months of the date of his departure. The ward's estate should not be charged with the expenses of the guardian's stay abroad for his own pleasure.

We are satisfied that the rulings of the probate court and the circuit court in refusing to allow the guardian's application for $1500 to cover the expense of maintaining his family during his absence, and for compensation for his services, were correct. We know of no ruling or law that would authorize such a payment out of the estate

of the ward, and the guardian cites no such authority. The guardian was not required to make the trip. He voluntarily took upon himself that task. He himself made the application for permission to make the visit with the ward. The evidence shows that he had relatives of his own in Syria with whom he visited and remained a great part of the time he was there. This was a privilege which he enjoyed at the expense of the ward's estate. Furthermore, Section 607, Revised Statutes Missouri, 1929, same section, Revised Statutes Missouri, 1939, Missouri Revised Statutes Annotated, section 607, relating to the commitment and care of incompetent war veterans, provides: ''The compensation allowed to guardians of such persons entitled to money benefits from the United States Veterans' Bureau shall not exceed five per cent of the income of a ward during any year.'' We are unable to agree with the guardian's argument that the statute, Section 607, *supra,* applies only to the commission due to a guardian who stays at the place of residence of the ward. We find nothing in the statute to warrant that view. On the contrary, it has been held that a veteran's money should be used as far as possible for his benefit with little diversion for administration costs and fees. [Veterans' Bureau v. Glenn, 226 Mo. App. 674, 46 S. W. (2d) 200. See also Hines v. Hook, 338 Mo. 114, 89 S. W. (2d) 52, and Hines v. Kemp, 338 Mo. 122, 89 S. W. (2d) 57.] The denial of said sum of $1500 to the guardian was proper.

We are unable to agree with the guardian's contention that the burden of proof is on the exceptor, administrator of veterans' affairs, to prove the items in the guardian's report which were not properly expended. This is not a case involving exceptions to an annual or other kind of settlement such as were involved in the cases cited by the guardian. Involved in the case at bar is a petition and report of the guardian asking for the court's approval of disbursements of the $5000 appropriated by the court, and the allowance of additional sums of $1782.06 and $1500 to the guardian. The fact that exceptions were filed to the guardian's petition and report does not relieve the guardian of the burden of proving the disbursements for which he claims credit. He, as the moving party, invoked the court's action, and the burden is on him to adduce reasonably satisfactory evidence that he is entitled to credit for the disbursements which he claims he made, to be entitled to gain the court's favorable action thereon, and that burden remains on him throughout the trial.

As to the removal of the guardian, ordered by the probate court and approved by the circuit court, we think that both courts made the only proper order possible under the evidence. His failure to produce receipts for the many disbursements for which receipts could have been shown, as well as the extravagant manner in which he disbursed the ward's funds, constituted ''neglect of duty'' and ''mismanagement'' within the meaning of Section 495, Revised Statutes

Missouri, 1929, in effect at the time of the events involved herein, and warranted the removal.

It is the duty of this court to reach its own conclusions on the law and the facts in this kind of a case, which is a statutory proceeding and not a jury case. [In re Claus' Estate (Mo. App.), 147 S. W. (2d) 199, 204; Ansley v. Richardson, 95 Mo. App. 332, 68 S. W. 609.] Ordinarily we should make our decision and direct the kind of judgment that we think the circuit court should have rendered. [Section 140 (c), Laws Missouri 1943, p. 395.] However, in view of the lack of evidence on which to base a finding and judgment as to the correct amount for which the guardian is entitled to credit, we are of the opinion that the judgment should be reversed and the cause remanded to the circuit court for the trial anew contemplated by the statute, Section 291, Revised Statutes Missouri, 1939, Missouri Revised Statutes Annotated, section 291. [See In re Claus' Estate (Mo. App.), 147 S. W. (2d) 199, 204.] All parties may thus have an opportunity to adduce evidence from which the court can properly find the amount of disbursements for which the guardian is lawfully entitled to credit out of the $5000 total appropriated by the probate court, and surcharge the guardian with the remainder of said sum.

Pending such new trial the circuit court should hold in abeyance its orders and judgment as to the disallowance of the $1782.06 and the $1500 claims of the guardian, as well as the removal of the guardian, and upon making its finding upon all the evidence, with respect to the amount to be allowed as credit to the guardian for disbursements out of the appropriated $5000 fund, enter its finding and final judgment therefor, including in such final judgment the orders and judgment held in abeyance above referred to, and, in addition thereto, enter an order requiring the guardian to make a final settlement to the time of the revocation of his authority as guardian, and certify all such orders and judgment to the probate court.

The circuit court ordered the costs of the proceeding therein to be taxed against the estate of Peter Mansour, n. c. m. We are of the opinion that the court erred in so doing. It will be recalled that said court disallowed the $1782.06 and the $1500 claims of the guardian, and also ordered his removal as guardian. In view of such findings and orders, which we hold were correct on the evidence, we can find no authority for taxing against the ward's estate the costs in the circuit court. That proceeding was an appeal taken by the guardian from the judgment of the probate court and the costs thereof were caused by the guardian taking such appeal. Since the circuit court reached the same conclusion as that of the probate court concerning the removal of the guardian, we do not see how the costs of the circuit court proceeding can properly be taxed against the ward's estate. If it could be said that the estate derived some benefit from the guardian's appeal to the circuit court, or that said appeal was neces-

sary in the administration of the ward's estate, then there would be a basis for taxing the costs thereof against the estate as costs of administration. Or, if the guardian had rendered a full and true account of his trust, even though some errors appeared therein, then the costs of his defense of his report might be held to be necessary costs of administration of the estate, as in the case of an administrator whose settlement has been attacked by exceptions. [Jacobs v. Jacobs, 99 Mo. App. 427, 436, 12 S. W. 457.] However, we have no such situation in the case at bar.

In entering its final judgment, after the trial anew, the circuit court should include an order taxing the costs of the proceedings in that court against the guardian.

The judgment of the circuit court is reversed and the cause remanded for further proceedings in that court not inconsistent with the views herein expressed. *Hughes, P. J.,* and *Anderson, J.,* concur.