**In the Matter of the ESTATE of Ethyle BOEVING, an incompetent.**

**William R. Boeving, Guardian, Appellant.**

**No. 8309.**

Springfield Court of Appeals.

Missouri.

Feb. 18, 1965.

Gilbert D. Stephenson, Kennett, for guardian-appellant.

George R. Wilhoit, Jr., Poplar Bluff, amicus curiae.

PER CURIAM.

This is an appeal by William R. Boeving (hereinafter referred to as the guardian) from the judgment of the Circuit Court of Butler County entered on October 14, 1963, which removed Boeving as guardian of the person and estate of his mother, Ethyle Boeving, an incompetent (hereinafter referred to as the ward).

We first inquire into our appellate jurisdiction, as is our duty even though it be not challenged by the parties. Morrow v. Caloric Appliance Corp., Mo.App., 362 S.W.2d 282, 283(2); Hammonds v. Hammonds, Mo.App., 289 S.W.2d 903, 904 (1). The inventory and appraisement of the ward's estate included realty valued at $47,275 and personalty valued at $68,549.-51; and, in the guardian's second annual settlement filed during the latter part of May 1963 (but not approved by the probate court), shortly before institution of the instant proceeding to remove the guardian, he charged himself with personalty valued at $67,318.40. However, in a proceeding such as this, "the amount in dispute" for

appellate jurisdictional purposes [Art. V, Sec. 3, Const. of 1945, 2 V.A.M.S.; Sec. 477.040] [1] is not the value of the ward's estate but the value of the office of guardian, to wit, the fees or compensation to which the removed and appealing guardian would be entitled for subsequent services as such.[2] The compensation of a guardian is such "as the court shall deem just and reasonable" [Sec. 475.265], and nothing in the instant record indicates the compensation which the instant guardian would receive. The appellate jurisdiction of our Supreme Court is limited [Dunnegan v. Gallop, Mo., 369 S.W.2d 206, 208(1); State on Inf. of Anderson ex rel. McNutt v. Northup, Mo., 367 S.W.2d 512, 515(10)] and, to be invoked, must be shown affirmatively by the transcript on appeal. Snowbarger v. M. F. A. Central Cooperative, Mo., 317 S.W.2d 390, 393(3); State ex rel. State Highway Com'n v. Schade, Mo., 265 S.W.2d 383, 384(2). On the record here presented, we are not ousted from our general appellate jurisdiction. In re Adelman's Estate, Mo., 370 S.W.2d 296, 297(1); In re Jackson's Will, Mo.App., 291 S.W.2d 214, 218(2–4).

Upon his petition [Sec. 475.060] averring, inter alia, that the ward's husband and former guardian had died and that the ward then was confined in a hospital at Poplar Bluff, and upon approval of his guardian's bond in the penal sum of $80,000 [Sec. 475.100], letters of guardianship were issued to William R. Boeving, the guardian herein, by the Probate Court of Butler County on May 10, 1961.

On July 30, 1962, the guardian filed in the probate court his first annual settlement covering the period to May 31, 1962, in which he reported (a) items of income aggregating $41,278.44 (including allowances of $18,900 from the estate of the ward's deceased husband, proceeds of $11,606.83

---

1. Except as otherwise specifically stated, all statutory references are to RSMo 1959, V.A.M.S., and all references to rules are to the Rules of Civil Procedure, V.A.M.R.

2. In re Wilson's Estate, 320 Mo. 975, 8 S.W.2d 973, 974(4), 975(5, 6); Fields v. Luck, 327 Mo. 113, 34 S.W.2d 710, 711(2, 3). See Rust v. Geneva Inv. Co., Mo., 124 S.W.2d 1135, 1137(5, 6); Powers v. Johnson, Mo., 302 S.W.2d 899.

from insurance policies on his life, farm rents of $4,918.51, stock dividends of $4,-363.80, social security payments of $1,464.-30, and a hospital refund of $25) and (b) items of expenditure aggregating $26,741.-90 (including $5,000 to the two Poplar Bluff attorneys, one of whom was the probate judge's son, *then* representing the guardian, *forty-six* other items in excess of $100 each, and innumerable smaller items). The first annual settlement was approved on the day it was filed, i.e., on July 30, 1962. On August 2, 1962, the penal sum of the guardian's bond was reduced from $80,000 to $60,000.

On or about October 8, 1962, the probate court entered an order appointing Joseph L. Smith of Kennett, Missouri (elsewhere in the transcript identified as a C.P.A.), as "cosigner" with the guardian of checks drawn on the ward's account.

On or about May 22, 1963, the guardian filed in the probate court his second annual settlement covering the period from May 31, 1962, to May 6, 1963, in which he reported (a) items of income aggregating $24,-087.28 (including an allowance of $3,900 from the estate of the ward's deceased husband, payments of $10,104.73 from the "Ethyle Boeving trust," checks for $1,153.-41 from life insurance companies, farm rents of $5,979.05, stock dividends of $1,-404.32, social security payments of $1,148.-40, interest of $280 on a time deposit, and an income tax refund of $117.37) and (b) items of expenditure aggregating $10,720.-30 (including *nineteen* items in excess of $100 each, as listed marginally,[3] and innumerable smaller items).

In the interim between the filing of the first annual settlement and the filing of the second annual settlement, the guardian dismissed his Poplar Bluff attorneys (because, so he says, of the $5,000 fee charged for services during the first year) and employed his present counsel, a Kennett attorney, who sought and was allowed a fee of $600 for services during the second year. The guardian earnestly avers that the probate judge's "dissatisfaction" with the second annual settlement stemmed from the guardian's dismissal of the judge's son as his attorney. Certainly we do not, on the meager and unsatisfactory record before us, honor and embrace so serious a charge against a respected member of the judiciary; but, the fact remains that, perhaps coincidentally, the guardian's difficulties seem to have begun with his change of counsel.

On May 27, 1963, the probate clerk wrote the guardian's attorney that "we are unable to accept your [second annual] settlement as filed herein," but the only specific complaint was that "you have not started your settlement with the exact balance as shown

| 3. | 6/25/62 | 339 | Forest Super Market, groceries | $ 124.82 |
|---|---|---|---|---|
| | 7/31/62 | 360 | Faust Super Market, groceries June and July | 126.63 |
| | 11/ 5/62 | 367 | Traveler's Ins. Co., bond for guardian | 318.40 |
| | 11/ 5/62 | 368 | Probate Court, Butler Co., fees for 1 year | 280.24 |
| | 12/ 3/62 | 370 | St. Vincent's Hospital, bill for ward | 1,307.79 |
| | 12/ 3/62 | 371 | Dr. S. R. Banet, medical service for ward | 350.00 |
| | 12/20/62 | 384 | St. Vincent's Hospital, bal. of bill for ward | 450.60 |
| | 1/ 2/63 | 391 | City Collector, 1962 taxes | 144.00 |
| | 1/ 2/63 | 392 | County Collector, 1962 taxes | 773.91 |
| | 1/ 2/63 | 394 | Mayo Clinic, complete checkup for ward | 391.00 |
| | 1/ 3/63 | 396 | Baumhoefer & Son, material/labor 813 N. Main | 538.75 |
| | 1/ 3/63 | 397 | Orkin, monthly treatment and termite proofing | 177.00 |
| | 1/17/63 | 405 | Newberrys, merchandise for ward | 111.46 |
| | 1/17/63 | 406 | Ross Welding, trash incinerator for A. B. home | 137.20 |
| | 1/21/63 | 412 | Wm. R. Boeving, personal spending money for ward | 150.00 |
| | 1/22/63 | 414 | Farmers Cash Store, merchandise for ward | 432.29 |
| | 3/26/63 | 434 | Mo. Natural Gas Co., Jan. and Feb. bills | 180.14 |
| | 4/ 2/63 | 440 | Faust Super Market, groceries | 171.27 |
| | 4/ 5/63 | 443 | Safeway Store, groceries and meats for ward | 117.43 |

on the previous settlement." After pointing out the two particulars in which the assets listed as on hand at the beginning of the second year differed from those shown in the first annual settlement as on hand at the end of the first year, the probate clerk's letter closed with the request, "kindly give this your prompt attention, correcting said settlement." The guardian's attorney replied under date of May 29, 1963; Joseph L. Smith, the Kennett C.P.A. cosigning the guardian's checks, talked with the probate clerk; and on June 5, 1963, "an amended first page to the [second] annual settlement" was mailed by the guardian's attorney to the probate clerk, with the request that the amended page be substituted for the first page as originally filed. This apparently satisfied the only complaint in the probate clerk's letter of May 27, since that complaint was *not* mentioned in the "Order To Show Cause Why Guardian Should Not Be Removed" (hereinafter referred to as the order to show cause), which was issued shortly thereafter, to wit, on June 10, 1963, in the following language and form:

"Now on this 10th day of June, 1963, the Court takes up for consideration a purported annual settlement filed by the guardian, William R. Boeving, and the Court finds that said purported annual settlement is filled with numerous and divers claims of credits which constitute unauthorized and unjustified expenditures upon the part of the guardian of large amounts of the funds belonging to the estate of this incompetent. Said purported settlement contains numerous items of the funds of the estate exceeding $100.00 each, and which alleged purchases made by the guardian, for the benefit of the incompetent, are not itemized so as to inform the Court of the true facts concerning said alleged expenditures.

"It is therefore, considered, ordered and adjudged by the Court that the said guardian, William R. Boeving, be and he is hereby cited to appear in this Court on the 26th day of June, 1963, and make a showing to show cause, if any he has, why he should not be removed from office as guardian of the person and estate of Ethyle Boeving, incompetent."

On account of injuries sustained on May 24, 1963, the probate judge was hospitalized for four weeks thereafter, so the order to show cause was issued by him during that period of hospitalization. At the hearing in circuit court, the probate judge agreed upon cross-examination that in his court some settlements by guardians were filed by their attorneys without personal appearance by the guardians; that, when "anything on the settlement" needed explanation, he required the guardian to come into court personally; but that, *before issuing the order to show cause in the instant proceeding,* he had not asked either the guardian or his then attorney to come into court personally and explain the second annual settlement. The probate judge also testified that he had "a rule" in his court that a guardian must obtain prior approval of any expenditure in excess of $100—"that is a rule that we follow in our court and it is a matter of expenditure of more than a hundred dollars, that the guardian first get appropriation from the court." The evidence did not show whether "the $100 rule" had been reduced to writing, or when or how it had been promulgated. The circuit judge foreclosed interrogation as to whether "the $100 rule" had been enforced during the *first* year of the guardianship under consideration, but it was established that no order to that effect had been entered in the Boeving guardianship or, for that matter, in any other guardianship.

When the circuit judge asked the probate judge why he had issued the order to show cause, this was the answer: "I issued it because he [the guardian] was absolutely treating the probate court in, well, just as if it wasn't, had no jurisdiction over the case in court; he took it upon himself to make any appropriations he saw fit."

The order to show cause, delivered to the sheriff for service on the guardian, was returned "as non-est," and the guardian did not appear in the probate court on the return date of the order, to wit, on June 26, 1963. However, the guardian's attorney did appear then and requested "time to prepare the showing of [the guardian] as to why he should not be removed." Whereupon, the probate court entered an order

"* * * that all funds belonging to the estate of Ethyle Boeving, incompetent, be frozen in the hands of the [bank] depository * * * ; that the attorney [amicus curiae], George R. Wilhoit, * * * take the public administrator, Clyde E. Richardson, to his assistance in procuring the services of James Tatum, certified public accountant, to make an audit of the funds belonging to the estate * * *, and the * * * guardian of said incompetent is ordered to surrender any and all records in his possession of and concerning the handling of funds * *, and this proceeding of removal of said guardian is passed, pending the making of said audit * * * and the filing of same in this court, and said citation for showing cause * * * to be reset for hearing following the filing of said auditor's report."

On July 6, 1963, the guardian filed his petition for disqualification of the probate judge [Sec. 472.060]; and on July 17, 1963, the proceeding to remove the guardian was certified to the Circuit Court of Butler County.

On the same date, to wit, on July 17, 1963, the guardian filed in the circuit court a motion to free the assets of the estate in order that the guardian might provide necessities for the ward; and on July 19, 1963, the circuit court modified the order of the probate court freezing the assets of the estate, authorized the guardian "to expend funds not to exceed the total sum of $1,000 for the benefit of the [ward] for her necessities," and directed the guardian to "keep a detailed account and receipts of all of said expenditures and promptly make and file his report of the same with this court."

On August 1, 1963, the guardian filed in the circuit court his motion to make the order to show cause more definite by specifying (a) the "claims of credits" in the second annual settlement alleged to have constituted "unauthorized and unjustified" expenditures and (b) the "purchases exceeding $100 each" alleged to have been "not itemized so as to inform the court of the true facts concerning said alleged expenditures," which said motion was, by the court, overruled on August 19, 1963.

At a formal call of the docket on October 7, 1963, this proceeding was set for hearing at 1 P.M. on October 14, 1963. On October 10, 1963, the guardian filed an application for disqualification of the circuit judge, alleging that he "[was] prejudiced against the guardian" and that knowledge of such prejudice had come to the guardian on October 8, 1963 [Rule 51.03(b); Sec. 508.090, as amended Laws of 1957, p. 294]; and, on the date of filing of said application, notice was given to the amicus curiae, who had appeared for and on behalf of the probate judge throughout the proceeding to remove the guardian, that the application would be called for hearing at 9 A.M. on October 14, 1963.

On October 10, 1963, the guardian also filed in the circuit court his written "settlement" or accounting of the $1,000 released by the circuit court's order of July 19. This "settlement" reported expenditures aggregating $924.57 and showed a balance of $95.43 on hand. Amicus curiae emphasized in the circuit court, and now emphasizes here, that on July 24, 1963, the guardian issued four of the listed checks, each for $100, to his own order. The "reason" for three of those checks was shown as "expense of ward and guardian for ward's checkup at Mayo Clinic," and the fourth as "personal expense money for ward for spending money on trip to Mayo Clinic."

Upon trial in the circuit court, the guardian's attorney remarked that, when the order of July 19 authorizing expenditures of not to exceed $1,000 for necessities was entered, it was "agreed, or at least it was contemplated, that the ward did in fact have to go to the Mayo Clinic * * *," and the circuit judge responded with the comment that "the court never agreed to any such thing as that." When the guardian's attorney then inquired, "was the court not aware that the guardian had to take his ward to the Mayo Clinic," the circuit judge said "I don't know," and a like inquiry to the amicus curiae elicited a similar answer, "frankly, I can't recall."

Pursuant to the notice theretofore given, the guardian's attorney called for hearing on October 14, 1963, the application for disqualification of the circuit judge. At the outset of the discussion concerning this application, the guardian's attorney repeated in open court "some of the statements" alleged to have been made previously by the circuit judge in the attorney's presence and by him communicated to the guardian, to wit, statements "to the effect that if the guardian had filed a proper account he would not have been in this trouble, and that had he filed a proper account, the probate judge would not have filed the show cause order." The circuit judge did not confirm or deny the statements attributed to him. Amicus curiae responded by vigorously opposing the application for disqualification on the stated theory that, since the proceeding had been certified to the circuit court upon disqualification of the probate judge, the circuit judge "is now sitting as the probate judge" and that the guardian "is entitled to one disqualification and he has had it" by disqualification of the probate judge. In turn, the guardian's attorney insisted that the fact that the cause had come to the circuit court on certification did not render the rules of civil procedure inapplicable in that tribunal, and the court's attention then was directed to Clow's Estate v. Clow, 237 Mo.App. 267, 167 S.W.2d 903, where it was held that a probate proceeding certified to the circuit court was "a civil suit" within the contemplation and meaning of the change of venue statute [then Sec. 1058, RSMo 1939; now Sec. 508.090, as amended Laws of 1957, p. 294—see Rule 51.03] and that a change of venue might be taken in the circuit court. Although observing that "it is not any pleasure to try the case," the circuit judge overruled instant guardian's application for disqualification and called upon the parties to proceed.

The guardian's attorney then presented his sworn application for continuance predicated upon three grounds, one of which, i. e., because the circuit court had directed the circuit clerk not to issue subpoenas requested by the guardian's attorney, merits elaboration. On October 10, 1963, the guardian's attorney had, by letter directed to the circuit clerk, requested the issuance of subpoenas duces tecum for fifty-two individuals to produce at the date of hearing "all records of financial or business transactions" with the guardian during the period covered by the second annual settlement. As the circuit clerk stated, this request (received on October 11) "was taken up with the court and the court ordered that they [the subpoenas] not be issued." This denial of process appears to have been prompted by the circumstances (a) that two of the individuals (namely, C. Douglas Dillon, Treasurer of the United States, and "Manager, St. Mary's Hospital, Rochester, Minnesota"), for whom subpoenas were requested, resided outside this state, and two others (namely, S. R. Banet, M.D., and "Manager, St. Vincent's Hospital") resided in St. Louis, and (b) that the guardian's attorney had said something to the effect that (to borrow the language of the circuit judge) "you [the guardian's attorney] was going to fill this court house up with witnesses and that it would take three weeks to try this."

■ The request by the guardian's attorney that subpoenas be issued for *out-of-state* witnesses was frivolous, indefensible

and unworthy of one who, by reason of his high calling, was an officer of the court. However, of the fifty-two individuals for whom subpoenas were requested, forty-five persons (among them James Tatum, the C.P.A. whom the probate judge had appointed more than three months previously to make an audit of the ward's estate) were listed as residing in Poplar Bluff, another as residing in the same county, and two (one of whom was Joseph L. Smith, the Kennett C.P.A.) as residing in adjoining counties. At the hearing on the application for continuance, the guardian's attorney explained that the persons, whom he had sought to subpoena, were those to whom the guardian had made payments from the ward's estate during the period covered by the second annual settlement, and that he had listed all of those persons because he had been unable to ascertain the specific items in that settlement for which explanation was desired and had been told by the amicus curiae "that he wanted every item on our settlement explained"—a statement not denied by the amicus curiae. In this connection, we note also that, when the guardian's attorney had taken the deposition of the probate judge on August 30, 1963, the witness had, pursuant to advice of the amicus curiae acting as his counsel, refused to answer numerous questions, among them one requesting him to "indicate which claims of credit [in the second annual settlement] constitute these unauthorized and unjustified expenditures on the part of the guardian, and which purchase[s] of items [exceeding] a hundred dollars are not itemized so as to inform you of the true facts concerning these expenditures." The amicus curiae here points out that, at the hearing on October 14, 1963, he offered to stipulate that "those items shown on the [second annual] settlement were paid * * * by checks written by this guardian," but more importantly he refused to stipulate either that the payments "were proper" or that they were "for the benefit of the incompetent."

Before the application for continuance was ruled, it was shown in the record that, when the proceeding was set on October 7 for hearing on October 14, the court directed that a subpoena duces tecum be issued for the guardian; that this subpoena was returned by the sheriff "as non-est"; but that, in a conference at the Kennett office of the guardian's attorney on the morning of October 8, the guardian had been informed of the setting on October 14 and of the issuance of a subpoena duces tecum directed to him. However, the guardian was not in court on October 14 because, according to his attorney, he (the guardian) had made conflicting "plans some two months" previously to attend "a bankers' meeting" in North Carolina and it "was imperative" that he honor "this commitment." The guardian had said that "he would try to be back but didn't know for sure that he could be back on October 14." Rejecting the suggestion of the guardian's attorney that the instant proceeding be reset at the top of the trial docket on November 6, (in the place of another case in which he was counsel for one party and the opposing attorney desired a continuance), the court overruled the application for continuance.

After other motions filed on behalf of the guardian (and in no wise material here) had been overruled summarily, the court proceeded with a brief trial on "the matter of the removal of guardian." At the outset, the court stated: "I think the principal question is whether or not he has obeyed the orders of the court, not so much as to whether or not he has misappropriated money. Of course that is another question. That might become material and very important, * * * but one of the main questions is whether or not he has obeyed the orders of the court and come in and answered questions that the court wanted to find out."

The only witnesses at the trial (and both were called by the circuit judge) were the guardian's attorney and the probate judge.

Their testimony was relatively brief, and the references thereto, with which this factual review has been interspersed, need not be repeated here. The testimony of the guardian's attorney was confined to identification of the four checks dated July 24, 1963, each for $100, which the guardian had issued to his own order allegedly for expenses of a trip by the ward (accompanied by the guardian) to the Mayo Clinic. In addition to the testimony hereinbefore digested, the probate judge said on direct examination by the court that the guardian "hasn't been in my office since 1962"; and, when the court inquired whether the guardian had "been requested to come in and talk to you about it," the probate judge said that "he has been served with written notice by mail." But the "written notice" was not offered, no effort was made to fix its date or to show its contents, and (as we have noted) on cross-examination the probate judge conceded that, *before issuing the order to show cause in the instant proceeding,* he had not asked either the guardian or his then attorney to come into court personally and explain the second annual settlement. No audit was presented at the trial, and there was no testimony as to whether an audit had been or was being made. In fact, no question was asked and no evidence was offered concerning any item or items in the second annual settlement.

After some preliminary comments in which heavy emphasis was laid on the guardian's failure to appear in court on the date of trial, the circuit court entered this judgment:

"The court having heard said matter and being now fully advised, finds as follows: That the guardian has failed and refused to comply with the orders of both the probate court and this circuit court; that he has been negligent, incompetent and inefficient in the *preformance* of his duties; that

he has failed to file proper reports with both courts, including vouchers, statements and receipts; that he has misappropriated money and property belonging to the estate of his ward; that he has deliberately failed and refused to appear in the probate court when requested to do so by the judge thereof; that he deliberately failed and refused to appear at this trial today, although he well knew that this cause was set for trial on this date, and although he well knew that a subpoena duces tecum had been issued for him to appear at this hearing today.

"WHEREFORE, it is ordered, adjudged and decreed by the court that the guardian herein, William R. Boeving, be and he is hereby removed as guardian of the estate of Ethyle Boeving incompetent. It is further ordered by the court that this cause be and the same is hereby remanded to the Probate Court of Butler County, Missouri, and all files pertaining thereto are ordered returned therewith."

The guardian has preserved and presented seven points. Several are not wholly without merit, but proper disposition of this appeal requires the ruling of only one, to wit, that the court erred in overruling the guardian's application for disqualification of the circuit judge. It should be pointed out preliminarily that no question has been raised and no objection has been interposed concerning the legal adequacy of the application in form and substance [Rule 51.-03(b)] or concerning the reasonableness and sufficiency of the notice given to the amicus curiae on October 10 that the application would be called for hearing on October 14.[4]

It is true that a probate proceeding certified to the circuit court retains its probate character [Hewitt v. Duncan's Estate, 226 Mo.App. 254, 258, 43 S.W.2d

---

4. By amendment effective *March 1, 1964,* Rule 51.06(c) now requires that such application must be filed "not less than five days before the day the case has been set for trial * * *."

87, 89(8)], and that, on such certification, the circuit court assumes and exercises "the function of the probate court." 3 Maus, Missouri Practice, § 490, 1. c. 444. But it does not follow that, as amicus curiae stoutly maintained in the circuit court, the guardian was foreclosed from disqualification of the circuit judge on the theory that "he [the guardian] is entitled to one disqualification and he has had it" by disqualification of the probate judge. For, on certification from the probate court, the circuit court "acquires jurisdiction *as a circuit court*" [In re Schwidde's Estate, Mo., 363 S.W.2d 585, 586]; and, although as to *substantive* matters it is governed by the laws of administration or guardianship (according to the nature of the proceeding), as to *procedural* matters it is subject to the rules of civil procedure. See Keele v. Weeks, 118 Mo.App. 262, 279, 94 S.W. 775, 781.

 Rule 51.03 permits, as did the antecedent statute [Sec. 508.090, as amended Laws of 1957, p. 294] a change of venue or disqualification of the circuit judge "in any civil suit." So, in determining whether an application for change of venue or disqualification of the judge properly may be entertained in any given proceeding in the circuit court, the inquiry is whether that proceeding is a "civil suit" within the contemplation and meaning of Rule 51.03.[5] And, while the right to a change of venue or to disqualify the judge does not exist except as granted by the rule, we are of the opinion that, as was true under the antecedent statute, the rule should be construed liberally in favor of the right to grant such change of venue or disqualification, insofar as the applicability of the rule to particular classes of civil proceedings is concerned.[6]

 As used in the antecedent statute [Sec. 508.090, as amended Laws of 1957, p. 294] and in the superseding rule [Rule 51.03], " 'suit' * * * means any *proceeding* for the redress of injury or the recovery of a right, and * * * 'civil' used in connection with the word 'suit' is in contradistinction to a 'criminal case'. 'Civil suit' then, in its broad aspect, means a *proceeding* by which rights of private individuals are protected or enforced." Hayes v. Hayes, 363 Mo. 583, 588, 252 S.W. 2d 323, 326–327. See State ex rel. Kochtitzky v. Riley, 203 Mo. 175, 185–188, 101 S.W. 567, 568–569, 12 L.R.A.,N.S., 900. Under this accepted judicial definition, the instant proceeding to remove the guardian undoubtedly was a "civil suit" in which an application to disqualify the circuit judge properly might have been filed.[7]

 Amicus curiae *now* seeks to justify the order overruling the motion to disqualify the circuit judge on the theory that such motion "was not made in good faith." But the cases cited by amicus curiae to this point are neither analogous nor persuasive. In Erhart v. Todd, Mo., 325 S.W.2d 750(3), and in State v. Davis, 203 Mo. 616, 102 S.W. 528, the applications to disqualify were filed *after commencement of trial.* In Pippas v. Pippas, Mo.App., 330 S.W.2d 132, it was held that defendant wife was not entitled to disqualify the circuit court for alleged prejudice on the ground, *speci-*

---

5. Hayes v. Hayes, 363 Mo. 583, 586, 252 S.W.2d 323, 325; State ex rel. Kochtitzky v. Riley, 203 Mo. 175, 185, 101 S.W. 567, 568, 12 L.R.A.,N.S., 900; State ex rel. Anderson Motor Service Co. v. Public Service Com'n, 234 Mo.App. 470, 489, 134 S.W.2d 1069, 1079(20), affirmed 348 Mo. 613, 154 S.W.2d 777; In re McFarland, 223 Mo.App. 826, 832–834, 12 S.W.2d 523, 526–527.

6. State ex rel. Sharp v. Knight, 224 Mo. App. 761, 765, 26 S.W.2d 1011, 1014

(3). See Hayes, supra, 363 Mo. at 588, 252 S.W.2d at 327; State ex rel. Kochtitzky, supra, 203 Mo. at 188, 101 S.W. at 569.

7. Rule 51.03(b); Clow's Estate v. Clow, 237 Mo.App. 267, 274, 167 S.W.2d 903, 905–906(6); 3 Maus, Missouri Practice, § 490 l. c. 444, footnote 46. See In re Alexander's Estate, Mo., 360 S.W.2d 92, 96–97; Keele v. Weeks, 118 Mo.App. 262, 265, 94 S.W. 775, 776.

*fically averred in her application by which she was bound,* that the judge had informed the wife's attorney that she was not entitled to alimony pendente lite, because in reaching and announcing that opinion the judge was doing no more than exercising " 'his judicial trial function' " for which he was not " 'to be successfully charged with prejudice' " even though he might have been mistaken. 330 S.W.2d at 135(3).

Amicus curiae argues that "it is obvious that the motion to disqualify was not made in good faith," because (a) the guardian's attorney had been informed on October 8, 1963, that his client thought it "imperative" for him to attend "a bankers' meeting" in North Carolina and he "didn't know for sure that he could be back on October 14," and (b) that, although the application to disqualify was filed on October 10, the guardian's attorney on the same date wrote the circuit clerk requesting the issuance of subpoenas for fifty-two witnesses. Neither circumstance necessarily demonstrated bad faith in the filing of the application to disqualify the circuit judge for his alleged prejudice against the guardian. In fact, the course of the proceeding subsequent to the filing of the application to disqualify confirmed the propriety of counsel for the guardian subpoenaing witnesses in preparation for a hearing should the application be overruled.

 Although, in determining whether an application to disqualify the judge has been filed in good faith, the court may consider what is shown by its own records, pleadings and files,[8] the court's private knowledge or belief as to the existence or non-existence of the ground stated in the application may not be considered.[9] When an application to disqualify the judge is filed, he " 'has power only to determine whether the application is in due form and due time, and if it is, to see that the proper steps are taken to substitute another judge'—he may not pass on his own qualifications." State ex rel. Kansas City Public Service Co. v. Waltner, 350 Mo. 1021, 1031, 169 S.W.2d 697, 700(2). See State v. Bailey, 344 Mo. 322, 328, 126 S.W.2d 224, 227(5). In other words, on an application to disqualify the judge "on account of the alleged prejudice of such judge, no evidence of such prejudice need be adduced." Hayes, supra, 363 Mo. at 588, 252 S.W.2d at 327(3). We recognize that questions as to whether presentation of an application to disqualify the judge is timely, as to whether notice of intended filing thereof is sufficient, and as to whether the application is sufficient in substance and form, are addressed to the *sound judicial discretion* of the court. Douglass v. White, 134 Mo. 228, 234, 34 S.W. 867. But when, on the facts of any given case, those questions are or should be settled in the affirmative, the duty of the court no longer is discretionary but becomes imperative, and the application should be granted as a matter of right, and not as a matter of favor or discretion.[10] On the record before us, we are unable to say that the application to disqualify the circuit judge was filed in bad faith; and, there being no substantial question as to whether presentation of the application was timely, as to whether notice of intended filing was sufficient, or as to whether the application was sufficient in substance and form, the application should have been granted as a matter of right. The court's refusal so to do constituted prejudicially reversible error, for which the judgment

---

8. Erhart v. Todd, Mo., 325 S.W.2d 750, 753; Padberg v. Padberg, Mo.App., 78 S.W.2d 555, 559(2); Planters' Bank v. Phillips, Mo.App., 186 S.W. 752, 753; St. Louis & S. F. R. Co. v. Big Three Mining Co., 139 Mo.App. 272, 275, 123 S.W. 70, 71.

9. Douglass v. White, 134 Mo. 228, 234, 34 S.W. 867, 868; Padberg, supra, 78 S.W.2d at 559(2). See St. Louis & S. F. R. Co., supra, 139 Mo.App. at 275, 123 S.W. at 71(3).

10. Douglass, supra, 134 Mo. at 234, 34 S.W. at 867–868; Ralston v. Ralston, Mo.App., 166 S.W.2d 235, 237(1); Hornig v. Jones, Mo.App., 269 S.W. 399(4). See St. Louis & S. F. R. Co., supra, 139 Mo.App. at 274, 123 S.W. at 71.

nisi must be set aside and the cause remanded.

In view of the conclusion reached, other questions pass out of the case on this appeal and need not be ruled. Ralston v. Ralston, Mo.App., 166 S.W.2d 235, 238(6). However, in the interest of minimizing the possibilty of error upon remand, we add these comments concerning the emphatic assertion of amicus curiae that "the guardian's actions and activities gave the court ample grounds, *both statutory and equitable,* for the removal of said guardian." It is true that the probate court has the inherent power to initiate, ex mero motu, a proceeding to remove a guardian; but, when it does, the citation or order to show cause should "sufficiently advise the [guardian] of the charge against him to enable him to make his defense." In re Ford, 157 Mo.App. 141, 154-156, 137 S.W. 32, 36. A proceeding to remove a guardian is one in rem; and, although there were early expressions to the contrary [5 Maus, Missouri Practice, § 1988, p. 335, footnote 37], it is now settled that, since the statutes [Secs. 475.110 and 473.140] enumerate the grounds upon which a guardian may be removed, removal (as distinguished from revocation of letters) may be ordered and adjudged by the probate court only upon a statutory ground or grounds.[11] The jurisdiction of the circuit court on appeal from, and a fortiori on certification by,

the probate court is a derivative jurisdiction[12] no greater and no less than that which the probate court lawfully might have exercised[13] and in the exercise of such derivative jurisdiction the circuit court, though possessing chancery powers, cannot enter any judgment which the probate court would have been without authority to enter.[14]

Intolerably long as this opinion already is, we should not close without a caveat to the guardian that nothing herein should be misinterpreted as implying approval or disapproval of the second annual settlement (or any items therein) or as signifying acceptance of counsel's explanations of the guardian's failure to appear in the probate court on the return date fixed in the order to show cause or in the circuit court on the date set for hearing. And it may not be inappropriate to suggest that the guardian would be well-advised to read and respect the plain statements of principle as to the duties of a guardian, which are found in the case of In re Mansour's Estate, 238 Mo.App. 623, 185 S.W.2d 360, 368-369(2-5), and, putting aside all manner of excuse and delay, to honor his imperative obligation to present himself at future settings.

It is the judgment of this court that the judgment of the circuit court be set aside and for naught held, and that the cause be remanded with directions to sustain the guardian's motion to disqualify

---

11. State ex rel. Baker v. Bird, 253 Mo. 569, 581, 162 S.W. 119, 122(4); In re McMenamy's Guardianship, 307 Mo. 98, 134, 270 S.W. 662, 673; State ex rel. McWilliams v. Armstrong, 320 Mo. 1122, 1129, 9 S.W.2d 600, 602; Davis v. Roberts, 206 Mo.App. 125, 130, 226 S.W. 662, 664(4); 5 Maus, Missouri Practice, § 1988, p. 335.

12. In re Mills' Estate, 349 Mo. 611, 162 S.W.2d 807, 810(3); In re Ozias' Estate, Mo.App., 29 S.W.2d 240, 242; Davis, supra, 206 Mo.App. at 130, 226 S.W. at 664(6); 4 Maus, Missouri Practice, § 1513, p. 632.

13. State ex rel. Kinealy v. Hostetter, 340 Mo. 965, 971, 104 S.W.2d 303, 307(5);

In re Murphy's Estate, Mo.App., 231 S.W.2d 200, 205(2); Evans v. York, Mo. App., 195 S.W.2d 902, 906(3). See In re Thomson's Estate, 362 Mo. 1043, 246 S.W.2d 791, 796(6), 29 A.L.R.2d 1239.

14. State ex rel. Baker, supra, 253 Mo. at 581, 162 S.W. at 122(5); In re Thomson's Estate, supra, 246 S.W.2d at 796 (6); In re Ozias' Estate, supra, 29 S.W. 2d at 242; 4 Maus, Missouri Practice, § 1513, p. 632. See Primeau v. Primeau, 317 Mo. 828, 838-839, 297 S.W. 382, 387, recognizing this principle although further holding that the circuit court may have jurisdiction, in an equitable action instituted therein, to remove for a cause not defined by statute.

the circuit judge and to "call in another circuit judge to sit in the cause, as authorized by Section 15 of Article V of the Constitution, or request the Supreme Court to transfer a judge to try such cause, as authorized by Section 6 of Article V of the Constitution" [Rule 51.03(b)], and for further proceedings thereafter not inconsistent with the views expressed herein.

All concur.